**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Serafin ALFONSO, Humberto Rayo, Fabian Mora, Primo Antonio Serrano-Tellez, Defendants-Appellants.**

Nos. 83–5164 to 83–5167.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 5, 1984.

Decided May 1, 1985.

Jeffrey L. Russell, Los Angeles, Cal., for plaintiff-appellee.

Richard G. Sherman, Los Angeles, Cal., for Alfonso.

David E. Moch, Los Angeles, Cal., for Rayo.

Michael D. Abzug, Los Angeles, Cal., for Mora.

Yolanda Bsrrera Gomez, Dep. Federal Public Defender, Los Angeles, Cal., for Serrano-Tellez.

Before TUTTLE, Senior Circuit Judge,* and HUG and POOLE, Circuit Judges.

POOLE, Circuit Judge:

Appellants Serafin Alfonso, Humberto Rayo, Fabian Mora and Primo Antonio Serrano-Tellez appeal their convictions of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Serrano-Tellez also appeals his conviction of importation of cocaine, in violation of 21 U.S.C. § 952(a). The district court denied motions to suppress evidence by Rayo, Mora, and Serrano-Tellez. Alfonso objects to the admission of a Drug Enforcement Administration Agent's testimony concerning a conversation between the agent and Alfonso in 1978.

For reasons set forth below, we affirm the convictions of Rayo, Mora and Serrano-Tellez. We reverse Alfonso's conviction.

I. *Facts*

In late January, 1983, a confidential informant told Los Angeles Police Department detectives that the vessel Ciudad de Santa Marta ["Santa Marta"] of the Gran Colombian Shipping Lines would soon arrive in Los Angeles Harbor carrying a large quantity of cocaine, which would be offloaded by Colombian nationals. The informant added that an organization which had smuggled cocaine from a Gran Colombian freighter in San Francisco earlier in January was involved in the Santa Marta operation. A federal wiretap in San Francisco also indicated a connection between the San Francisco and Los Angeles Gran Colombian smuggling operations.

As a result of this information, a task force was formed, consisting of the Los Angeles City Police and County Sheriff's Departments, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Customs Service, the Coast Guard, and the Los Angeles Port Warden's Office. When the Santa Marta docked in Los Angeles Harbor at about 1:30 p.m. on January 28, 1983, the task force began surveillance of the ship. At approximately the same time, Customs Inspector Michael Craig conducted a cursory customs search of the Santa Marta, limited to inspection of the ship's documents. Five inspectors accompanied Inspector Craig, one of whom conducted an immigration inspection, while another performed an agricultural inspection.

In the early evening hours of January 28, 1983, Serrano-Tellez and another man left the Santa Marta and walked to a nearby restaurant. Shortly thereafter, Alfonso ar-

---

* The Honorable Elbert Parr Tuttle, Senior United States Circuit Judge for the Eleventh Circuit, sitting by designation.

rived by car with Rayo and Mora. Serrano-Tellez and his companion entered the car and drove to the Queen City Motel. All defendants entered room 60. Two hours later, Rayo went to room 66, and Mora went to one of two other rooms rented by Alfonso.

On January 29, Mora drove Serrano-Tellez from the motel back to the Santa Marta. Mora returned to the Queen City Motel and to room 60. That afternoon, he placed scuba tanks and a wet suit in an automobile and drove to the Santa Marta. After picking up Serrano-Tellez at the ship, Mora drove to the Cabrillo Beach public boat ramp, where he and Serrano-Tellez were observed making gestures toward the Santa Marta. Mora then drove Serrano-Tellez back to the ship and returned to room 60 of the motel. He later left room 60, removed a package from Alfonso's car and placed it in another automobile, looking around guardedly as if to detect surveillance. Mora and two companions later stopped at the Surf Motel en route to a sporting goods store, where they purchased fishing poles. They then drove to the Cabrillo Beach boat ramp. At the boat ramp, Mora put on the scuba gear, entered the water, and swam out toward the Santa Marta until he was beyond surveillance. Surveilling agents did not witness his return.

Meanwhile, on January 29, cargo was loaded aboard the Santa Marta, and several vendors boarded the ship to sell merchandise. That afternoon, two men boarded the Santa Marta and left the ship a short time later carrying a box. Law enforcement officials stopped them. A search of their vehicle unearthed forty pounds of cocaine. About 6:00 p.m., two women who departed the ship carrying duffel bags were searched. Seventeen pounds of cocaine were seized. Later in the evening, customs agents stopped and seized cocaine from yet another individual who had boarded the Santa Marta, left it shortly, and had driven away.

Near midnight on January 29 under Customs direction, law enforcement officers from several agencies boarded the Santa Marta to conduct a thorough search of the ship. Two customs agents and an FBI agent went to cabin 642, occupied by Serrano-Tellez. Search of his cabin unearthed a duffel bag and a zipper bag tied together with a long rope under a set of bunk beds. Inside the bags were packages of cocaine wrapped in plastic.

About 6:30 a.m. on January 30, Los Angeles police officers went to room 60 of the Queen City Motel. Alfonso opened the door. The officers searched a piece of luggage in the room and found $58,720.00 in currency, identification cards in Alfonso's name, and a wallet with identification papers of Mora. In Alfonso's wallet officers found $2,200.00, a paper bearing the name "Antonio Tellez S.," and a business card identical to the one found in Mora's wallet. Alfonso's explanation of the funds was that he was a gambler. Surveillance had observed Alfonso attending a professional boxing match the day before. No contraband was found in Alfonso's room.

With drawn guns the officers then knocked on the door of room 66. When Rayo answered, they identified themselves as police, arrested him, and searched the room for weapons or other persons. After holstering their guns, they asked Rayo for permission to search his luggage. Rayo agreed, stating that he "had nothing to hide" and "had come here to gamble." The officers found more than $42,000.00 in currency in a suitcase, $1,200.00 in his pants and a paper which they identified as a "pay/owe" sheet used in narcotics trafficking.

Later on the morning of January 30, the Los Angeles Police Department received a telephone call from the manager of the Surf Motel stating that someone wearing a wetsuit had come to the motel and requested another key to room 3. Police officers promptly went to room 3 and knocked on the door. It partially opened, revealing Mora and two other men. The officers told Mora that he was under arrest. After hearing a noise coming from the bathroom, the police ordered the unknown occupant out of the bathroom, and Alicia Garcia

emerged. The officers then conducted a warrantless sweep of the room, during which they discovered scuba gear, a wetsuit, a rental receipt for that equipment, and a drawing of a ship.

We now consider the appellants' several claims of error.

## II. *The Search of the Santa Marta and Seizure of Evidence from Serrano-Tellez's Cabin*

Serrano-Tellez asserts that the district court should have granted his motion to suppress the evidence discovered in his cabin aboard the ship. He insists that the search of the ship beginning near midnight on January 29, approximately 36 hours after it had docked, cannot be considered a border search for two reasons: conditions aboard the Santa Marta had changed between the time the ship docked and the time of the search, and law enforcement agents other than Customs agents participated in the search. Serrano-Tellez also argues that even if the search is deemed a proper border search, the search of his private living quarters on the ship was unreasonable under the Fourth Amendment.

### A. *The Search of the Santa Marta*

■ Border searches are unique in the law of search and seizure. The mere entry into the United States from a foreign country provides sufficient justification for a border search. *Klein v. United States*, 472 F.2d 847, 849 (9th Cir.1973). As the Supreme Court has observed,

a port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search.

*United States v. Thirty Seven Photographs*, 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971). Consistent with the right of a sovereign to protect itself, *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977), travelers entering the country may be required to identify themselves, show their entitlement to come in, and identify their belongings as lawfully admissible. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

■ The Constitution empowers Congress "[t]o regulate commerce with foreign nations," U.S. Const. art. I, § 8, cl. 3; border searches thus raise different considerations and call into play rules of law distinct from other searches. *United States v. 12 200-ft. Reels of Film*, 413 U.S. 123, 125, 93 S.Ct. 2665, 2667, 37 L.Ed.2d 500 (1973). The primary purpose of a border search is to seize contraband property sought to be brought into the country. *Alexander v. United States*, 362 F.2d 379, 382 (9th Cir.), *cert. denied*, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966). To this end Congress has given Customs agents broad authority to search upon entry into the United States vehicles and persons, as well as personal effects, where they suspect the presence of merchandise subject to duty or unlawfully imported into the United States. 19 U.S.C. § 482.[1] Border searches are by their very

---

1. Section 482 of Title 19 provides that:

 Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast or otherwise, he shall seize and secure the same for trial.

 Title 19 U.S.C. § 1581(a), moreover, grants customs agents the authority to

nature reasonable under the Fourth Amendment, and require neither a warrant, probable cause, nor even articulable suspicion. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Des Jardins*, 747 F.2d 499, 502 (9th Cir.1984).

 The practical difficulty of getting to and searching every vehicle or carrier at the precise moment it crosses land or sea borders has led to recognition that border searches need not always actually occur at the physical border. *United States v. Stone*, 659 F.2d 569, 572 (5th Cir.1981). Border searches may take place at the functional equivalent of the border. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). The rules of the "border search" extend to crossings of ocean boundaries as well as the land boundaries with Mexico and Canada. *See United States v. Solmes*, 527 F.2d 1370, 1372 (9th Cir.1975). For example, the search of an aircraft which arrived at an inland airport after a nonstop flight from Mexico has been deemed a search at the functional equivalent of the border, *United States v. Potter*, 552 F.2d 901 (9th Cir.1977); so also has been the search of a ship which was observed anchored off Mexico and which later docked at Mission Bay in San Diego. *United States v. Solmes*, 527 F.2d 1370 (9th Cir.1975).

Thus, searches occurring subsequent to a border crossing often also fall within the doctrine of the "extended border search." *United States v. Espericueta-Reyes*, 631 F.2d 616, 619–20 (9th Cir.1980). Customs agents may learn or realize the significance of suspicious circumstances only after a vehicle or person has crossed the border, *Jones v. United States*, 326 F.2d 124 (9th Cir.1963) *cert. denied*, 377 U.S. 956, 84 S.Ct. 1635, 12 L.Ed.2d 499 (1964). Of necessity, the agents may delay a search in a reasonable effort to sweep in associates of suspected smugglers. *Espericueta-Reyes*, 631 F.2d at 620; Note, *From Bags to Body Cavities: The Law of Body Search*, 74 Colum L.Rev. 53, 70–71 n. 96 (1974).

 Although some courts have sought to delineate differences between extended border searches and searches at the functional equivalent of the border, *e.g., United States v. Niver*, 689 F.2d 520, 525–26 (5th Cir.1982), the instant case illustrates the difficulty of making sharp distinctions in this area. The search of the Santa Marta occurred in Los Angeles Harbor, its first anchorage in United States waters. It is immaterial whether the situs be called the functional equivalent of the border, or the border itself. The searches occurred within a day and a half after arrival and after an initial cursory search. Under the circumstances, the place of searches was the functional equivalent of the border, and, as we view the facts, they constituted extended border searches.

 We recognize, of course, that time and place are relevant, since the level of suspicion for extended border searches is stricter than the standard for ordinary border searches. Extended border searches occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy. Therefore, extended border searches must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity, rather than simply mere suspicion or no suspicion. *United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1422–23 (9th Cir.1984); *United States v. Garcia*, 672 F.2d 1349, 1367 (11th Cir.1982). Although we have no difficulty in relating this site with the border, we shall, because of the time factor— the lapse of thirty-six hours in conducting the searches—examine the facts under the rules of extended border search.

 *Alexander v. United States*, 362 F.2d 379 (9th Cir.), *cert. denied*, 385 U.S.

---

go on board of any vessel or vehicle at any place in the United States or within the customs waters ... and examine the manifest and other documents and papers and

examine, inspect, and search the vessel, or vehicle and every part thereof and any person, trunk, package or cargo on board....

977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966) set forth the general standards for searches that do not occur at the time of entry or in the immediate vicinity of the border:

> the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or about the vehicle at the time of the search was aboard the vehicle at the time of entry into the jurisdiction of the United States.

*Id.* at 382. Thus, we look here to determine whether the totality of facts and circumstances within the Customs officers' knowledge warranted a reasonable certainty that the contraband they sought had crossed the border; we know that the vessel did. *United States v. Corral-Villavicencio,* 753 F.2d 785, 788–89 (9th Cir.1985); *United States v. Driscoll,* 632 F.2d 737, 739 (9th Cir.1980). Where the contraband is not discovered immediately upon entry, continuity of surveillance over the subject of the search is a factor in determining identity, and hence enters into the totality of circumstances. *United States v. Caicedo-Guarnizo,* 723 F.2d 1420, 1422 (9th Cir. 1984).

■ Serrano-Tellez's first argument is that participation in a search by persons who are not Customs agents[2] nullified the search as a border search. This contention is unacceptable. It is sufficient that the search be executed under the authority and direction of those agencies having jurisdiction in safeguarding the borders. True, in *United States v. Soto-Soto,* 598 F.2d 545 (9th Cir.1979), we did not characterize an FBI agent's vehicle search at the border as a valid border search because the FBI agent was not specifically authorized to make a border search, and the search was conducted as part of a general law enforce-

ment effort. *Id.* at 549–50. Here, in contrast, the search of the Santa Marta was part of a collaborative effort under the aegis of and in cooperation with Customs agents.

Customs agents have specific authority to conduct border searches under 19 U.S.C. § 482. Their presence and supervision distinguish this search from merely a "random" law enforcement effort; rather it was a planned, coordinated execution of an official inspection and search upon entry into the country. Given such authorization, there is no reason why the limited forces of the Customs Service, Border Patrol, Immigration officers, and similarly designated officials cannot enlist the aid of other forces in forming a task force sufficient to meet their needs. We have previously upheld a cooperative search by the Customs Service and the Coast Guard. *United States v. Odneal,* 565 F.2d 598 (9th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978). Serrano-Tellez's argument would have the Customs Service powerless to seek assistance from other law enforcement agencies in conducting border searches. Such restriction would make impossible many efforts to halt the illicit importation of contraband.

■ Nor does the initial cursory Customs inspection of the Santa Marta invalidate the later and more thorough search of the ship. We have said that searches need not necessarily occur at the instant a vehicle arrives at the border or at its functional equivalent. *E.g., United States v. Caicedo-Guarnizo,* 723 F.2d 1420, 1422–23 (9th Cir.1984). The fact that some search occurred at the time of the initial border crossing simply does not prevent later searches from coming under the rules of border searches. *United States v. Espericueta-Reyes,* 631 F.2d 616, 619 (9th Cir. 1980). Thus, in *Espericueta-Reyes,* two searches following an initial border search

---

**2.** At oral argument, the government agreed that an FBI agent was present during the search of Serrano-Tellez's cabin, but asserted that it was not clear that he actually participated in the search. His participation in the search would not alter our conclusion that the search of Serrano-Tellez's cabin was a valid border search.

were upheld where surveillance was constant, the later searches were within an hour and a half of the border crossing and the searches were conducted at or near the border. *Id.* at 620. *See also, United States v. Terry,* 446 F.2d 579, 582 (9th Cir.), *cert. denied,* 404 U.S. 946, 92 S.Ct. 301, 30 L.Ed.2d 261 (1971) (second search of an automobile about an hour after the border crossing held to be a border search); *United States v. Smith,* 629 F.2d 1301, 1304 (9th Cir.1980) (search of an international airplane passenger in San Francisco after a previous search of the same passenger in Los Angeles was a border search).

The time interval in this case was longer than in the above cited authorities. But we note that the Santa Marta is a large structure. The information communicated to the authorities was that a large quantity of contraband was aboard as part of an operation by organized but unidentified persons. We are not prepared to hold that, under the present circumstances, law enforcement agencies were required immediately to reveal their knowledge and purpose by rushing into a ship-wide search. *Cf., United States v. Johns,* —— U.S. ——, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (warrantless search of packages three days after their removal from vehicles that agents had probable cause to believe contained contraband reasonable under the Fourth Amendment).

To be quite clear, we do not view the thirty-six hour delay as dispositive. Courts have upheld border searches one hundred fifty miles from the border and one hundred forty-two hours after a border crossing, *United States v. Martinez,* 481 F.2d 214 (5th Cir.1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974); and fifteen hours after the border crossing, twenty miles away. *Rodriquez-Gonzalez v. United States,* 378 F.2d 256 (9th Cir. 1967). Particularly in light of the information which came to the officers and the constant surveillance of the Santa Marta, the delay did not take this case outside the border search doctrine. It is enough that the totality of circumstances reasonably supported the agents' conclusion that the

contraband found was indeed aboard when the vessel came into the country.

The facts that cargo was loaded aboard the Santa Marta, and that persons entered and exited the ship without the surveilling officers being able to verify what, if anything, they might have brought on board must be considered. Under some circumstances, conditions may have been so vulnerable to change after a border crossing as to rebut any reasonable certainty that contraband later found was aboard a carrier at entry. For example, in *United States v. Petersen,* 473 F.2d 874 (9th Cir.1973), officers lost sight of a vehicle for 10 minutes after it crossed the border, during which the driver picked up two passengers. We concluded that it was not reasonably certain that contraband found was in the vehicle when it came across the border. *Id.* at 876. And the same defect of certainty was found in *United States v. Anderson,* 509 F.2d 724 (9th Cir.), *cert. denied,* 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975), where a vehicle made several stops at the crossing, picking up and discharging passengers, one of whom was seen retrieving a package hidden near a palm tree. We held that given the breaks in surveillance, it was at least as reasonable to infer that contraband found in the car had been picked up at the tree. *Id.* at 726.

In the case of the Santa Marta, however, there was reasonable certainty that the considerable contraband found was aboard when the ship made port. Arrests and searches of several persons as they left the ship led to the seizure of cocaine. It was therefore reasonable for the officers to believe, when they began the searches, that the cocaine they had seized was aboard the Santa Marta when the ship crossed the border, had not been brought there after its arrival, and that there was still more on board, for that was the nature of their information.

Constant surveillance of the Santa Marta tended to confirm the confidential informant. The information had been that Rayo would be involved in offloading cocaine

from the Santa Marta and that he was connected with the same organization known previously to have engaged in smuggling from a Gran Colombian freighter docked in San Francisco using swimmers in wetsuits to help in offloading. Officers had seen Mora swimming toward the Santa Marta in scuba gear. Thereafter several persons had been arrested leaving the ship with substantial quantities of cocaine. We conclude that the totality of circumstances supported reasonable suspicion that criminal activity was occurring aboard a large ship. Time and surveillance were needed in order to identify the responsible persons. Therefore, we find that the delay was reasonable and that postponement of the search of the Santa Marta was justified.

### B. *The Search of Serrano-Tellez's Cabin*

Serrano-Tellez further argues that even if the search of the Santa Marta is deemed a proper border search, its scope, extending as it did to sealed packages beneath a bunk bed in his living quarters, was unreasonable under the Fourth Amendment. The government, on the other hand, maintains there is no legitimate privacy interest immune from border search in any part of a vessel entering the United States.

We have found no cases directly confronting the permissible scope of a border search involving the living quarters of a ship. In *United States v. Williams*, 617 F.2d 1063 (5th Cir.1980) (en banc), the Fifth Circuit held that reasonable suspicion that evidence of criminal activity or contraband will be found is necessary to support the search of any private area of the hold of a vessel in international waters. *Id.* at 1087. While the *Williams* court expressly declined to decide what minimal degree of cause is reasonable to test searches of living quarters and personal effects aboard

vessels, *Id.* at n. 26, nine judges on the panel would have held that there is no legitimate privacy interest in any part of a vessel's hold. *Id.* at n. 25. *See also, United States v. Piner*, 608 F.2d 358, 361–64 (9th Cir.1979) (Kennedy, J., dissenting) (while search of crew's quarters or locked compartment aboard ship might constitute an invasion of privacy, seizure of evidence in plain view in a lighted cabin below deck by officer once he boarded a vessel did not).

*Williams* offers limited guidance here, since it did not involve a border search, but a Customs inspection at sea by the Coast Guard pursuant to 14 U.S.C. § 89(a).[3] Indeed, in reaffirming the reasonable suspicion requirement for a Customs search of a ship that had not crossed the border, the Eleventh Circuit contrasted the limited search of non-private areas permissible in a Customs search with the plenary authority of Customs officers to conduct border searches. *United States v. Herrera*, 711 F.2d 1546, 1550 n. 6 (11th Cir.1983), *modified*, 727 F.2d 1016 (11th Cir.1984). Border searches are premised upon the right of the government to prevent the importation of contraband or undeclared merchandise and the general understanding that persons, parcels, and vehicles crossing the border may be searched, *United States v. Weil*, 432 F.2d 1320, 1323 (9th Cir.1970), *cert. denied*, 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230 (1971). The breadth of that authorization is a factor in balancing the need for the search against the invasion the search entails. *United States v. Guadalupe-Garza*, 421 F.2d 876, 878 (9th Cir. 1970).

Obviously, a search of the private living quarters of a ship is more intrusive than a search of other areas. *See United*

---

**3.** Section 89(a) of Title 14 empowers the Coast Guard to

make inquiries, examinations, inspections, searches, seizures and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of law of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

**738**

*States v. Eagon,* 707 F.2d 362, 366 (9th Cir.1982), (Boochever, J., concurring), *cert. denied,* — U.S. —, 104 S.Ct. 483, 78 L.Ed.2d 680 (1983); *United States v. Streifel,* 665 F.2d 414, 423 (2d Cir.1981). The private living quarters are at least analogous to a private dwelling. As a result, even in the context of a border search, the search of private living quarters on a ship should require something more than naked suspicion. There was more in this case.

█ In our view, the information known to the search party in this case, including the informant's tip, their own observations, and the arrests and seizure of cocaine from persons leaving the ship, justified reasonable suspicion that contraband was aboard the Santa Marta. We have concluded that the search of the ship was a valid extended border search. We now hold that at least the same level of reasonable suspicion sufficiently supported the search of private living quarters aboard the ship during that search. Serrano-Tellez's

motion to suppress evidence was properly denied.[4]

### III. *The Admission of Prior Acts Evidence Against Alfonso*

Alfonso objects to the trial testimony of special agent Lopez, a Drug Enforcement Administration agent. Lopez had met Alfonso and one Esposito in November 1978, in New York. According to Lopez, Alfonso had sought Esposito's help in offloading some "stuff" from a pier after it arrived by ship. Lopez also testified that Alfonso indicated that the "stuff" was cocaine, and that it had come from the boat or was to be gotten off the boat. The trial judge admitted the Lopez testimony to show "intent, knowledge, and perhaps modus operandi."[5] A limiting instruction emphasized that the evidence was not admitted to prove Alfonso's character, but solely as it might bear upon Alfonso's "intent and knowledge" because it was conduct "similar" to Alfonso's conduct in January, 1983.[6] Alfonso chal-

4. Because the Santa Marta was due to depart Los Angeles on the morning of January 30, 1984, the district court found that exigent circumstances justified the warrantless search of the ship and its living quarters. In light of our discussion we need not decide this issue. But *see United States v. Duncan,* 693 F.2d 971, 976–78 (9th Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983) (border search doctrine extends to searches of individuals leaving the country).

5. In ruling upon the admission of Agent Lopez's testimony, the trial judge stated

We're talking about admitting this act not to show character to commit a crime, and I would advise the jury that that's not admissible for that. It would be admissible to show, perhaps, intent or knowledge. I don't know about modus operandi. Perhaps. But at least intent and knowledge, it seems to me. And I think the prior act is sufficiently similar. We're talking about cocaine. We're talking about cocaine from a ship being brought ashore by someone else.

Now, the close enough in time, we're talking about four years and three months, approximately. I think that's, according to the authorities, some authorities the government has cited—and I'll be glad to hear contrary authorities—seven-year-old similar conduct, Third Circuit, a 1979 case, et cetera.

The evidence of the prior act is certainly not some hearsay suggestion. It comes, I

gather, from the representation of Mr. Phillips, directly from a percipient witness, who had the discussions personally with the party. Now, there's no question that this has prejudice. As a matter of fact, the government hopes everything it introduces has substantial prejudice to the defendant. But the probative value is substantial in this case in view of what we know—at least believe—to be the defense from the very beginning of the case, that this is an innocent person, who had the money because he was a gambler, and knows nothing about the narcotic transactions in question.

I think, with an appropriate limiting instruction, that the evidence may come in. I've done the balancing that is necessary under the circumstances. I believe the probative value of the evidence does outweigh any potential prejudice.

Record at trial 978–79.

6. The judge instructed the jury that

I'm going to be giving you an instruction as it relates to the testimony of the next witness. The next witness will be discussing a prior act or prior conduct of Mr. Serafin Alfonso. The testimony that this witness gives is limited to the defendant Serafin Alfonso, and the evidence of the prior act or conduct of Mr. Alfonso is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion, that is, in January of 1983, was in

lenges similarity and claims that the prejudicial effect of the testimony outweighed any probative value it had.

Evidence of specific wrongful conduct is not admissible to prove the character of a person or to show that he acted in conformity with such alleged character. "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b).

Admission of evidence of prior similar acts is within the trial judge's discretion. *United States v. Cutler*, 676 F.2d 1245, 1249 (9th Cir.1982). If admitted, we review for abuse of that discretion. *United States v. Winters*, 729 F.2d 602, 604 (9th Cir.1984); *United States v. Espinoza*, 578 F.2d 224, 228 (9th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 151, 58 L.Ed.2d 151 (1978). Rule 404(b) is a rule of inclusion, *United States v. Young*, 573 F.2d 1137, 1139–40 (9th Cir.1978). Thus, evidence of past wrongful acts is admissible if it is relevant to an issue *other* than the defendant's character or criminal propensity. *United States v. Bowman*, 720 F.2d 1103, 1105 (9th Cir.1983).

Nevertheless, evidence of prior crimes or wrongful conduct is potentially prejudicial and may only be admitted if (1) it is similar enough, and close enough in time to be relevant; (2) the evidence concerning the prior crime or act is clear and convincing; and (3) the probative value of the evidence outweighs the potential prejudice to the defendant. *United States v. Herrera-Medina*, 609 F.2d 376, 379 (9th Cir.1979); *United States v. Brashier*, 548 F.2d 1315, 1325 (9th Cir.1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977).[7] The burden of showing that such evidence meets these requirements of relevance rests with the government, *United States v. Herrera-Medina*, 609 F.2d 376, 379 (9th Cir.1969); the government "must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from other acts evidence." *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir.1982).

The evidence here did not show that Alfonso's conversation with Agent Lopez resulted in his arrest or conviction, although that does not automatically preclude admissibility. *E.g.*, *United States v. Nadler*, 698 F.2d 995, 1000 (9th Cir.1983) (evidence of a previous counterfeiting operation permitted). But the fact that Alfonso was not shown to have been arrested or prosecuted for the 1978 incident raises questions of probative value, that is, whether that *discussion* somehow tends to prove that Alfonso's highly ambiguous conduct amounted to commission of the crimes charged here. *United States v. Herrera-Medina*, 609 F.2d 376, 380 (9th Cir.1979).

Nor does the five year gap between the 1978 conversation and the present charges automatically require excluding the evidence. Courts have sanctioned the admission of evidence of equal vintage under Fed.R.Evid. 404(b), *United States v. Zeidman*, 540 F.2d 314, 319 (7th Cir.1976), and even older (to show motive, intent, plan and absence of mistake or accident). *United States v. Reilly*, 456 F.Supp. 211, 221 (E.D. Pa.1978) *aff'd*, 601 F.2d 577 (3d Cir.), *cert. denied*, 444 U.S. 903, 100 S.Ct. 216, 62 L.Ed.2d 140 (1979).

---

conformity with some other act; in this case, in November of 1978. The evidence is being admitted solely as it may reflect—and the reflection is entirely up to you—upon Mr. Alfonso's intent and knowledge in January of 1983, when the events that you have heard occurred.
Record at trial 984–85.

7. Recently, in *United States v. Bailleaux*, 685 F.2d 1105 (9th Cir.1982), the court divided the test for admitting evidence of prior crimes into four parts. According to the court, (1) there must be clear and convincing proof that the defendant committed the other crime; (2) the crime must not be too remote in time; (3) in some instances, the prior crime must be similar to the present offense; and (4) prior crime evidence must be introduced to prove an element of the charged offense that is a material issue in the case. If these factors are satisfied, the court is to balance the probative value of the evidence against its prejudicial effect. *Id.* at 1109–1110.

The troubling question is whether Alfonso's 1978 statement was really probative of his relevant knowledge or intent with respect to the charges of possession and conspiracy in January of 1983. In the 1978 conversation Alfonso asked assistance in offloading from a pier a quantity of cocaine which had been on a ship, or which would be on a ship at some future time. That would have been probative of Alfonso's intent in 1978. But such evidence seems not at all to illuminate the facts of his rental of motel rooms, his possession of a large amount of money, or his possession of identification papers of others, nearly five years later.

The government hypothesized that he was the probable purchaser of cocaine which was on the Santa Marta. We do not see how the ancient conversation tends to prove that theory. Proof of an intent to do one thing on an earlier occasion proves little about an intent to execute a dissimilar act at a later time. Alfonso was not shown to have done the same thing on both occasions. Evidence of that kind could well resolve ambiguity as to the real nature of the act to be proved—the "probandum." *See United States v. Hernandez-Miranda,* 601 F.2d 1104, 1108 (9th Cir.1979). The only real inference which the fact trier could draw here is that Alfonso once talked about removing something from a ship, and therefore was likely a sometime smuggler. This says no more than that a person with Alfonso's history has the propensity to become involved in smuggling contraband from a ship.

 If that be its purpose, Rule 404(b) denies admission. The evidence against Alfonso was tenuous. Over $50,000 was found in Alfonso's hotel room. His wallet held papers bearing Antonio Tellez' name, and he had a wallet with Mora's identification. Alfonso had already been seen in the company of defendants Rayo, Mora and Serrano-Tellez. The paper evidence of Alfonso's acquaintance with his co-defendants was admissible, but highly equivocal. The evidence, however, that five years earlier he had propositioned a longshoreman to help him get cocaine from a ship or pier did not tend logically to prove—without more—that his association with the co-defendants amounted to guilt of conspiracy to smuggle or of possession with intent to distribute cocaine. We conclude that the testimony should have been disallowed. Under these close circumstances, we cannot say that it is more probable than not that such erroneous admission of Agent Lopez's testimony did not materially affect the verdict. *United States v. Bettencourt,* 614 F.2d 214, 218 (9th Cir.1980). Hence Alfonso's conviction must be reversed.

**IV.** *The Search of Rayo's Luggage*

 Rayo contends that his consent to the search of his luggage and pants was involuntary. He also argues that the failure to give him a warning under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before obtaining his consent to the search requires suppression of the evidence. The district judge found that Rayo's consent was voluntary. Whether a consent to search was voluntary is a question of fact, subject to the clearly erroneous standard of review. *United States v. Fleishman,* 684 F.2d 1329, 1334 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982).

 It is the government's burden to show that consent was given freely and voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 221–22, 93 S.Ct. 2041, 2045–46, 36 L.Ed.2d 854 (1973). Voluntariness is a factual issue based on the totality of circumstances surrounding the giving of consent. *Id.* at 227, 93 S.Ct. at 2047; *United States v. Ritter,* 752 F.2d 435, 439 (9th Cir.1985). On appeal the evidence must be viewed in the light most favorable to the verdict, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The government and Rayo disagree as to the encounter in his hotel room. The district judge who saw, heard, and evaluated the testimony on the suppression issue accepted the government's view. That determination is not shown to be clearly erroneous. Fed.R.Civ.P. 52(a).

When the police knocked on Rayo's motel room door they told him in Spanish that they were police. When he opened the door, their guns were drawn and he was arrested. Such an armed confrontation is of course a factor in the voluntariness inquiry, *see United States v. Perez*, 644 F.2d 1299, 1303 (9th Cir.1981). But after entering Rayo's room and determining that there were no weapons or other persons present, the officers holstered their guns. Although under arrest, Rayo was not handcuffed. The fact of custody does not itself negate voluntariness. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *United States v. Hall*, 565 F.2d 917, 920 (5th Cir.1978).

Nor does it necessarily follow that because he did not receive *Miranda* warnings until five hours later, after he was brought to the police station, consent to the search was vitiated. The failure to receive *Miranda* warnings is another factor to be considered, *United States v. Ritter*, 752 F.2d at 439; *United States v. Lemon*, 550 F.2d 467, 472 n. 5 (9th Cir. 1977); as is also the delay in receipt of the warnings. While in the hotel room the officers did inform Rayo of the purpose of their investigation, and he responded that he had "nothing to hide," and that he was in Los Angeles "to gamble." He repeated that statement when the police discovered the funds in his suitcase. These statements were exculpatory. The district court found them voluntary. Rayo has shown no prejudice from the delay in advising him of his *Miranda* rights. The suppression motion was properly denied.[8]

## V. *The Arrest of Mora and Protective Sweep of His Hotel Room*

Mora argues that the district court erred in denying his motion to suppress items taken from his hotel room following his arrest. He maintains that there was neither probable cause for arrest, nor justification for the warrantless protective sweep of his room.

The ultimate conclusion of presence or absence of probable cause is a mixed question of law and fact. *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v. One Twin Engine Beech Aircraft*, 533 F.2d 1106, 1108–09 (9th Cir.1976). We review the underlying facts under the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure. We review the court's ultimate conclusion *de novo. Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *United States v. McConney*, 728 F.2d 1195, 1200–04 (9th Cir.) (en banc), *cert. denied*, — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We apply the same standard in reviewing whether exigent circumstances justified the warrantless protective sweep of Mora's hotel room. *United States v. Hicks*, 752 F.2d 379, 383 (9th Cir.1985). Probable cause consists of

> facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.

*Michigan v. De Fillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Thornton*, 710 F.2d 513, 515 (9th Cir. 1983).

The district court concluded that the acts and circumstances known to the officers

---

8. Rayo emphasizes the holding in *United States v. Noti*, 731 F.2d 610 (9th Cir.1984) that as part of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a defendant must be informed of his right to the presence of an attorney during as well as before questioning. *Noti*, 731 F.2d at 615. He asserts that the failure to so warn him renders invalid consent to the search of his belongings. This case involves consent to a search, not admissions made after a defective and therefore null, *Miranda* warning. Since the totality of circumstances must be considered in determining the voluntariness of consent to a search, *United States v. Lemon*, 550 F.2d 467, 472 n. 5 (9th Cir.1977), Rayo's argument loses force.

warranted their belief that Mora had committed and was committing an offense. We defer to the trial court's resolution of the evidence presented to it. Mora had met with other smuggling suspects, including crew member Serrano-Tellez. At the Queen City Motel, he was seen removing a package from Alfonso's car and placing it into another car, looking about as if to detect surveillance.

The agents saw Mora don a wetsuit and scuba tanks on January 29 and swim in Los Angeles Harbor toward the Santa Marta. He and Serrano-Tellez had been seen gesturing toward the ship. On January 30, 1984, when the Los Angeles police officers reached the Surf Motel, Alfonso and Serrano-Tellez had been arrested, and thirty five pounds of cocaine wrapped in waterproof material had been seized from Serrano-Tellez's cabin aboard the Santa Marta. The officers had had word of a recent smuggling operation in San Francisco involving another Gran Colombian vessel that also relied upon the use of wetsuits and scuba gear. Another informant indicated that the same smuggling organization was involved in the San Francisco and Los Angeles smuggling efforts. Thus, the district judge clearly had evidence from which a reasonable person could conclude that it was probable that Mora's actions were criminal in nature. Therefore, there existed probable cause for his arrest.

Even though there be probable cause to arrest, the Fourth Amendment does not sanction warrantless nonconsensual entry into a suspect's dwelling for purposes of a routine felony arrest except in exigent situations. *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1374, 63 L.Ed.2d 639 (1980). The government argues that exigent circumstances existed. This requires the government to show that the warrantless entry of Mora's hotel room was imperative. *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir.1983).

Exigency has been defined as those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.

*United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Officers acting on probable cause and in good faith who reasonably believe that evidence may be destroyed or that they may be endangered may undertake a warrantless entry through an open door, after having knocked, identified themselves, and sensed suspicious circumstances. *United States v. Kunkler*, 679 F.2d 187, 190–92 (9th Cir.1982).

Law enforcement officers of course are reasonable in wanting to assure that suspects are not armed, and to neutralize the threat of physical harm. *Terry v. Ohio*, 392 U.S. 1, 23–24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968). When suspects in a drug transaction learn they have been discovered, undue delay may result in the destruction of contraband or increase the likelihood of violence. *United States v. Manfredi*, 722 F.2d 519, 523 (9th Cir.1983).

Nevertheless, search of a residence merely because a suspect is arrested inside does not follow as a matter of routine. *United States v. Gardner*, 627 F.2d 906, 910 (9th Cir.1980). An arrest even on probable cause does not itself automatically provide exigent circumstances justifying a warrantless search of the suspect's house. *See United States v. Whitten*, 706 F.2d 1000, 1014 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).

Exigent circumstances justified the warrantless entry into Mora's hotel room. The arrest of suspects had already begun by that time, and several suspects remained at large. The manager of the Surf Motel had called the police, informing them that a person in scuba gear and several

others had appeared and were in room 3 of the motel. When the door to that room was opened after police knocked and identified themselves, they saw Mora near the bed, and two other men. They also heard a "hurried scuffling noise" coming from the bathroom. It was reasonable to believe that concealed presences might pose danger, or that an unidentified person might be able to destroy evidence. This could supply the exigency required for search. *United States v. Impink,* 728 F.2d 1228, 1231 (9th Cir.1984) (to establish exigent circumstances due to possible destruction of evidence there must be probable cause to suspect that evidence is present on the premises; mere suspicion that evidence may be present cannot justify warrantless entry). A protective sweep of room 3 was therefore justified. *United States v. Gardner,* 627 F.2d 906, 909–10 (9th Cir. 1980).

On entering, the officers saw on a table a drawing of a ship, scuba gear on the floor, a wet suit in the bathroom and a rental receipt for underwater equipment on top of a suitcase. Under the plain view doctrine, visible evidentiary items may be seized by officers lawfully on the premises. *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983) (citations omitted). Since the police officers were lawfully present and the seizure of the items was valid under the plain view doctrine, the district court correctly denied Mora's motion to suppress.

## VI. *Conclusion*

In summary, the district court correctly denied the suppression motions of defendants Serrano-Tellez, Rayo and Mora. Their convictions are affirmed. The admission of prior acts evidence against Alfonso, however, was an abuse of discretion, and not harmless error. Accordingly, his conviction is reversed.

AFFIRMED IN PART and REVERSED IN PART.