CLAY, Circuit Judge,
dissenting.
The majority misapplies the extended border search doctrine such that it deprives citizens of the right to be free from unreasonable searches and seizures under the Fourth Amendment in proximity to border crossings. While I agree with the majority’s conclusion in Part II that we have jurisdiction over this appeal, I dissent from Part III of the majority opinion.
I.
On the day of the search in question, Customs and Border Patrol Officers (“customs officials” or “officers”) had been alerted by an Internal Revenue Service (“IRS”) agent that Defendant and her companion, Michael Ely, would be arriving by plane from Amsterdam, Netherlands and that the IRS was interested in the laptop computers that they would be carrying. While it is unclear from the record precisely what the IRS suspected with regard to Defendant’s and Ely’s laptops, it is clear that the tip was in no way related to a suspicion of currency smuggling. Based on this tip, the customs officials redirected Defendant and Ely to the secondary inspection station after their initial screening. Defendant filled out her customs declaration form and declared that she was in possession of $3,000. Defendant underwent a twenty-five-minute-long secondary inspection of her person and her luggage. After completing this lengthy search, the officers had discovered nothing unlawful in Defendant’s possession. Defendant remained at the security checkpoint for an additional thirty minutes waiting for Ely’s search to be completed. During the time she was still in the officers’ presence, the officers declined to subject her to a supplemental routine border search, indicating that she was no longer a subject of suspicion. As the officers continued to search Ely, Defendant indicated that she needed to purchase her ticket for the next leg of her trip. Defendant subsequently left the security checkpoint station, after which time she was completely out of view of all of the customs officials. The officers chose not to place her under any surveillance within the airport after she left the security checkpoint. The officers’ inspection of Ely continued in Defendant’s absence for another hour.
As the officers continued inspecting Ely’s luggage, it was discovered that he was in possession of over $13,000, which exceeded the amount Ely had declared on his customs declaration form. After being told he would be arrested, Ely advised the officers that he wished to release his luggage to Defendant. Officer Polley, the *598 supervising officer, had Defendant paged and informed her on the airport telephone that Ely was being arrested and that she should return to pick up his luggage. Thus, approximately ninety minutes after the completion of the search of Defendant, Polley dispatched Officer Key to find and retrieve Defendant. Key found her and brought her back to the security checkpoint in the aiiport van. Key advised Defendant that she could not leave her luggage unattended and that she would need to bring it back with her. Defendant’s luggage was placed in Officer Key’s van, and Defendant was taken back to the security checkpoint where Ely’s luggage was being searched. At some point prior to her return, Polley, who was responsible for ordering the reinspection of Defendant’s luggage, made the decision to reinspect Defendant’s luggage. He based this decision on the fact that Defendant and Ely were traveling companions, the previous tip he had received prior to her initial inspection, and the fact that she, as a Department of Defense contractor, was “rather well-paid.” (J.A. at 160). Thus, Defendant’s luggage was not returned to her once she was back at the security checkpoint; instead, it remained in the custody of the officers.
As Defendant watched as the officers continue to search her friend Ely, the officers noticed that she appeared “nervous” and “flustered.” Officer Crum, after speaking with Polley and being told that Polley wanted her luggage reinspected, instructed Officer Key and Officer Waters to retrieve Defendant’s luggage from the van and begin the reinspection. Once the luggage had been taken out of the van, Key asked Defendant if everything in the bags was hers and she responded that it was. At this point, Key began to search Defendant’s bags. Once he had begun the search, Key asked her if she wanted to amend her declaration about how much currency she was carrying; and she responded that she did, amending her declaration of $3,000 to $12,000. (J.A. at 183-84). After the search was completed, Key had uncovered additional currency in excess of what she had declared. The final search of Defendant’s luggage, conducted over ninety minutes after she had crossed the border and following the time during which she had been under no surveillance while in the general airport for at least an hour, yielded the discovery of a total of $17,358.
II.
Generally speaking, “border searches,” which occur as individuals enter and leave the United States, do not require a warrant. United States v. Montoya De Hernandez, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Routine searches that take place at the border have long been recognized as reasonable. United States v. Ramsey, 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Routine border searches may take place, however, at what would be considered the functional equivalent of a border. The Supreme Court introduced the concept of a border’s functional equivalent in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). The Court, however, declined to elaborate upon exactly what constitutes the functional equivalent of a border, opting instead to give the following examples:
searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.
*599 Almeida-Sanchez, 413 U.S. at 273, 93 S.Ct. 2535. The Court then went on to explain that a search on “a California road that lies at all points at least 20 miles north of the Mexican border” has not occurred at the functional equivalent of a border. Id. While not explicitly stated by the Court, the key attribute of the functional equivalent of a border is its proximity to the actual border. See id.; United States v. Boumelhem, 339 F.3d 414, 420 (6th Cir.2003). In Boumelhem, we adopted the functional equivalent of a border doctrine. Boumelhem, 339 F.3d at 420. However, the extended border search doctrine contemplated today goes a step beyond Boumelhem. The extended border search doctrine, which several circuits have adopted, “provides that non-routine border searches that occur near the border are deemed constitutionally permissible if reasonable under the Fourth Amendment.” United States v. Yang, 286 F.3d 940, 945 (7th Cir.2002).
Courts have continued to classify searches as “routine” even after substantial time or significant physical space has separated the suspect from the border crossing. See United States v. Ogbuehi, 18 F.3d 807, 813 (9th Cir.1994) (deeming routine a secondary search that occurred only a few minutes after the defendant had crossed the border and was less than sixty feet away); United States v. Wardlaw, 576 F.2d 932, 935 (1st Cir.1978) (finding that when a suspect has had his or her luggage checked, but remains at the site of the border, a second inspection is still a routine search). Thus, had the officers in the instant case taken advantage of the thirty-minute period during which Defendant remained at the security checkpoint waiting for Ely, the search would have most likely been considered routine and no additional showing of reasonableness would be necessary. See Boumelhem, 339 F.3d 414, 420.
However, as a number of courts have observed, there comes a point when “a subject’s relationship with the border becomes so attenuated that customs officials lose the right to detain him without a warrant.” United States v. Yang, 286 F.3d 940, 948 (7th Cir.2002). By determining exactly where this point lies, the extended border search doctrine attempts to resolve a tension in Fourth Amendment jurisprudence. While it is necessary for the government to vigorously police its borders, this doctrine cannot simply become shorthand for diminished Fourth Amendment protections in circumstances where the search and seizure bears little relationship to a legitimate border search. Thus, a search is reasonable under the extended border search doctrine when: “(1) there is a reasonable certainty that a border crossing has occurred; (2) there is a reasonable certainty that no change in condition of the luggage has occurred since the border crossing; and (3) there is a reasonable suspicion that criminal activity has occurred.” Id. at 945. As the majority correctly notes, there is no dispute that Defendant had crossed a border, so we will focus our attention on the other two prongs.
III.
A. Change in the Condition of the Luggage
The question of whether a reasonable certainty exists that there has been no change in the condition of a defendant’s luggage has traditionally been answered by examining the totality of the circumstances. See United States v. Alfonso, 759 F.2d 728, 735 (9th Cir.1985). While declining to create a rigid test to determine whether this prong is met, courts have consistently looked to three factors to make this determination. These factors are a suspect’s distance from the checkpoint, the amount of time that elapsed between the border crossing and the de *600 tention, and whether the suspect was under surveillance while away from the checkpoint. See, e.g., United States v. Caicedo-Guarnizo, 723 F.2d 1420, 1423 (9th Cir.1984); United States v. Fogelman, 586 F.2d 337, 339-340 (5th Cir.1978).
The validity of an extended border search is dependent upon the officers’ certainty that the suspect was in possession of any contraband when the border crossing occurred; otherwise, the doctrine simply unconstitutionally lowers the probable cause requirement for justifying the search of a citizen. Caicedo-Guarnizo, 723 F.2d at 1422 (“The validity of such a search depends on whether the fact finder, viewing the totality of the circumstances, is reasonably certain that the suspected smuggler did not acquire the contraband after crossing the border.”). Thus, it is essential that officers be able to point to some evidence that the suspect was in possession of the contraband at the time of the border crossing. While temporal and physical proximity to the checkpoint can raise an inference that no change in the condition of luggage has occurred, surveillance of the suspect is the most direct way to insure that the suspect did not simply come into possession of the contraband after the border crossing. See Alexander v. United States, 362 F.2d 379, 382 (9th Cir.1966). Accordingly, surveillance of the suspect while he or she is away from the security checkpoint has traditionally been viewed as one of the hallmarks of reasonable certainty with respect to establishing that there has been no change to the condition of the luggage. See, e.g., Alfonso, 759 F.2d at 735; United States v. Espericuetar-Reyes, 631 F.2d 616, 620 (9th Cir.1980).
This point is particularly salient in a situation like the instant case, where the contraband is not something that is illegal outside of the context of a border crossing. Unlike a case where a suspect is found in possession of an illegal narcotic or substance, which is unlawful no matter when the suspect possesses it, Defendant in the instant case was found to be in possession of currency over the amount of $10,000, an act which is unlawful only when such a sum is not declared at the border. This case raises the concern of punishing a citizen for acquiring something that may have been perfectly lawful when acquired; thus, it is of paramount importance that the border patrol agents be reasonably certain that Defendant was in possession of the additional currency when she crossed the border.
Surveillance of a suspect during his or her absence from the security checkpoint is the most effective means of providing evidence that the condition of a person’s luggage has remained unchanged after the person has passed through a security checkpoint. In fact, the Fourth Circuit has gone so far as to call surveillance “the most important single factor in assessing reasonableness” of a search under the extended border search doctrine. United States v. Bilir, 592 F.2d 735, 741 (4th Cir.1979). Similarly, the Ninth Circuit has included the existence of surveillance of the suspect as an explicit element of its “Alexander test,” which that court uses to determine whether there is reasonable certainty that there has been no change in the condition of the luggage. See Espericueta-Reyes (citing Alexander, 362 F.2d at 382-83 for the proposition that reasonable certainty should be determined by looking to the totality of the circumstances, which involves considering the amount of time elapsed, the distance from the border, and “the manner and extent of surveillance”). Other courts that have adopted the extended border search doctrine have likewise given substantial weight to the fact that the suspect was under surveillance while away from the security checkpoint in determining that the subsequent search *601 was reasonable. See, e.g., United States v. Garcia, 672 F.2d 1349, 1367 (11th Cir.1982); United States v. Fogelman, 586 F.2d 337, 339-340 (5th Cir.1978).
There are rare instances in which courts have found a search reasonable under this doctrine despite the fact that there was no continuous surveillance of the suspect in his or her absence from the checkpoint. As the majority observes, in United States v. Mejias, 452 F.2d 1190 (9th Cir.1971), the court upheld a search that occurred ninety minutes after a suspect passed through customs even though he was not under constant surveillance. Importantly, the suspect in that case maintained a close physical proximity to the security checkpoint area, which allowed one of the customs officials to monitor his actions after the initial search. Id. at 1192. Thus, the question in that case was not whether surveillance had to occur, but whether the surveillance had to be continuous. The court held that where other factors raised a strong presumption that no change in the condition of the luggage had occurred, the court could accept brief lapses in surveillance and still find with reasonable certainty that there had been no change in the condition of the luggage. Id. at 1193.
Likewise, the Seventh Circuit’s holding in Yang can be distinguished on its facts. In that case, the court found in favor of the government on this factor, even though the suspect had been away from the checkpoint for between thirty and forty-five minutes and had not been under surveillance. Yang, 286 F.3d at 948. The court reasoned that because the suspect had entered a different terminal during that time, and thus, his luggage was uncovered while it was in the possession of airport personnel, it was highly unlikely that there had been any change in its condition since the border crossing. Id. See also United States v. Walters, 591 F.2d 1195, 1198 (5th Cir.1979) (finding a search reasonable despite a lack of surveillance where fifty-five minutes elapsed since the border crossing, but the defendant “was not significantly removed physically or temporally from the border.”). Importantly, each of these cases acknowledged the fact that a common requirement was disregarded by not requiring surveillance of the defendant and explained the court’s rationale for doing so. Where a court finds a search to be reasonable in spite of the fact that the suspect was not under surveillance for a period of time, there must be facts akin to those in Yang and Walters that justify disregarding “the most important single factor in assessing reasonableness.” Bilir, 592 F.2d at 741.
The instant case is simply devoid of such facts. Not only was Defendant never under surveillance, but there are no facts whatsoever that can make up for this lack of surveillance. The majority opinion bases its conclusion that there had been no change in the condition of Defendant’s luggage during the intervening time between the two searches entirely on two facts that fall woefully short of providing a justification for the search. First, the majority reasons that the amount of money found in Defendant’s possession beyond her original $3,000 declaration, “over $7,000” (the amount was actually $14,358), was not an amount that likely could be obtained from an airport ATM. Second, the majority claims that the only activity in which Defendant could have engaged in the interval between the two searches was to purchase another airline ticket, which means she would have spent money instead of obtaining more. The majority’s insistence that Defendant could not have obtained the money from an ATM ignores the fact that Defendant could have simply acquired the additional funds from another person once she entered the airport, which would not have involved the use of an ATM at all. While it is unnecessary for us to speculate *602 as to the source of the money, the “suspension of reality” of which the majority speaks is far from necessary in order to suppose that Defendant may have obtained the money after she crossed the border and departed from the border checkpoint.
More to the point, none of the facts upon which the majority relies were known at the time that the officers searched Defendant’s luggage. It hardly needs stating that a search cannot be retroactively justified by facts uncovered during the course of that search. Such an elementary maxim is well established. United States v. Jacobsen, 466 U.S. 109, 115, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); Whiteley v. Warden, 401 U.S. 560, 567, n. 11, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Rios v. United States, 364 U.S. 253, 261-262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Miller v. United States, 357 U.S. 301, 312, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Byars v. United States, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927). The majority’s ex post facto approach of justifying a search based on facts or evidence not known at the time that the search was conducted is wholly at odds with the requirement that reasonable suspicion or probable cause exist prior to a search being undertaken. The majority’s holding runs directly contrary to the requirements of the Fourth Amendment, the extended border search doctrine this Court purports to adopt today, and even fundamental principles of logic. In the absence of observable facts or verifiable information prior to the search, the majority is entirely without support for its finding that there was a reasonable certainty that there had been no change in the condition of Defendant’s luggage at the time it was searched.
B. Reasonable Suspicion
The majority’s analysis of the final prong of the extended border search doctrine is likewise deficient. Polley, the officer responsible for ordering the reinspection of Defendant’s luggage, admitted that he made his decision to reinspect Defendant’s luggage before she had arrived back at the security checkpoint. Polley further admitted that the facts he relied upon in deciding to reinspect Defendant’s luggage were 1) that Defendant and Ely were traveling companions; 2) the previous tip he had received prior to her initial inspection; and 3) that Defendant had a relatively high-paying job. The first stated reason is alone insufficient to justify a search of Defendant. It is well-established that “guilt by association” may not be used to justify a search of an individual. Ybarra v. Ill., 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). An equally unsupportable ground to justify the search is the fact that Defendant had a relatively high-paying job.
The previous tip the officers received about Defendant and Ely likewise provides no support for a finding of reasonable suspicion. Polley received this tip before Defendant deplaned, and based on that tip, Defendant was flagged and subjected to heightened screening precautions. No evidence was uncovered during the initial search of Defendant or the more extensive secondary search to confirm the details of this tip. Further, Defendant was released after her inspection, was not reinspected while she remained in the area of the security checkpoint, and was not placed under any surveillance when she finally left the area. Clearly, Polley was satisfied at that point that whatever suspicion had arisen from the tip was unfounded. Continuing suspicion of wrongdoing after an uncorroborated tip has been fully investigated and discounted cannot be called rea *603 sonable. Daugherty v. Campbell, 38 F.3d 554, 557 (6th Cir.1994). Thus, Polley’s admitted justification for ordering the search of Defendant’s luggage falls far short of reasonable suspicion.
The justifications offered by the other officers who, upon Polley’s orders, initiated the search are no better. Importantly, the search had already begun before Defendant amended her declaration and before she was questioned about whether she had obtained any additional money while she was away from the security checkpoint. Thus, these facts cannot be used to support a post hoe rationalization for a search already in progress. See Northrop v. Trippett, 265 F.3d 372, 382 (6th Cir.2001). Accordingly, the only facts which could have given rise to reasonable suspicion were Defendant’s nervous behavior and her comment to Key about paying tax on money declared on her customs declaration form.
Behavior must be viewed in context in order to determine whether, in a specific situation, it gives rise to reasonable suspicion of criminal behavior. Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In the instant case, the majority erroneously focuses on Defendant’s “nervous” and “fidgety” behavior without placing that behavior in context. Defendant had just been told that her acquaintance was being arrested and that she had to come back and retrieve his luggage. When she arrived at the security checkpoint, she observed him being searched by officers and the money uncovered during the search “in plain sight” on the table. (J.A. at 182). Further, at this point, her own luggage was out of her possession, and it was not clear whether Defendant was free to leave. Viewed in context, Defendant’s nervousness does not seem suspicious inasmuch as she was watching a friend get arrested, and it was unclear whether she was in custody as well.
This case poses an interesting problem because Polley admitted that the decision to reinspect Defendant’s bags was made sometime “between the time [he] had spoken to her and asked her to return to [the security checkpoint] and her arriving back at [the security checkpoint].” (J.A. at 161). Thus, Defendant was ostensibly at the checkpoint only to pick up Ely’s bags, but she had agreed for her bags to be transported back to the checkpoint, and they were not going to be returned to her without being searched. In light of the situation with which she was confronted, Defendant’s nervous appearance should not have been viewed as establishing reasonable suspicion of criminal activity. Finally, Defendant’s passing comment that she thought that declaring money when she crossed the border would require her to pay tax is not sufficient by itself to give rise to reasonable suspicion in order to justify the reinspection. In fact, none of the facts emphasized by the majority actually support a finding of reasonable suspicion, and, accordingly, the government cannot succeed on this prong.
The majority erroneously relies upon Whren v. United States, 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) and its progeny to support the proposition that “the actual motivations of the individual officers” are not relevant to the analysis before this Court. Id. However, such an argument is misplaced. While a search may be justified based on observable behavior giving rise to reasonable suspicion, the behavior observed in this case cannot support a finding of reasonable suspicion; accordingly, the district court did not commit clear error in finding that the officers lacked reasonable suspicion to justify reinspecting Defendant’s luggage. This search was wholly unreasonable under the *604 extended border search doctrine inasmuch as both the second and third prongs weigh strongly in favor of Defendant. Therefore, I respectfully dissent from the majority opinion and would affirm the district court’s grant of Defendant’s motion to dismiss.