### UNITED STATES of America

v.

Victor Enrique COSTILLA–ALFANO, Victor Jose Farias–Caballero, Henri Caesar Yamunaque–Nunez, Faustino Purizaga–Marin, and Luis Alberto Rivera–Vidal, Defendants.

**Crim. No. 88–326–K.**

United States District Court, D. Massachusetts.

Nov. 30, 1989.

reach the issue of whether the documents could also be withheld based on exemption five.

**328**

Jonathan Chiel, Boston, Mass., for the U.S.

Eileen Donoghue, Boston, Mass., for Victor Enrique Costilla–Alfano.

Lenore Glazer, Jamaica Plain, Mass., for Henry Cesar Yamunaque–Nunez.

Memorandum

KEETON, District Judge.

I. Findings of Fact

In the early morning hours of October 14, 1988, the M/T SOLIMAR, a Peruvian vessel, docked at the Belcher Oil Terminal in South Boston. Shortly thereafter immigration and customs officials boarded the vessel and issued shore passes to the crew members.

Customs Inspectors Michael Cunningham and David Loney began an intermittent surveillance of the SOLIMAR at about 5:00 p.m. that evening. At about 8:30 p.m., while parked parallel to the SOLIMAR and between two nearby oil tanks, the inspectors observed three crew members—later identified as Costilla–Alfano, Farias–Caballero, and Yamunaque–Nunez—disembark from the ship. About thirty seconds later, a crew member later identified as Purizaga–Marin followed, and thirty seconds after that, a crew member later identified as Rivera–Vidal. Because the SOLIMAR had not been under constant surveillance since its arrival, the inspectors did not know whether any of the five crew members had also left the ship earlier in the day.

The crew members walked west, parallel to the water, until they reached a dirt road leading to East First Street. They turned left on that dirt road and travelled south toward one of the three exits of the Belcher Oil Terminal on East First Street. As the five, separated by the two thirty-second gaps, walked around the first oil tank, the inspectors briefly lost sight of them. The first three crew members shortly reappeared in a gap between the two tanks. At that point, the inspectors were approximately sixty feet from the three crew members and noticed that they were walking stiffly with restricted movements. Furthermore, the three crew members were wearing outer jackets which appeared unusually heavy considering the mild temperature (about 50°F). That their jackets were all zipped up further aroused the inspectors' suspicions.

The inspectors again lost sight of the first three crew members as they walked behind the second oil tank. Shortly thereafter, the inspectors watched as Purizaga–Marin appeared between the two tanks. He, too, was wearing a jacket which appeared unusually heavy and which was all zipped up. He, also, was walking in a stiff manner; indeed, the inspectors noted that his movements appeared even more restricted than those of the first three crew members.

After Purizaga–Marin disappeared behind the second oil tank, the inspectors waited for the fifth crew member, Rivera–Vidal, to appear between the two tanks.

He never did. The evidence suggests that Rivera–Vidal fled back to the SOLIMAR from which he watched as his co-defendants were apprehended.

After about thirty seconds, during which Rivera–Vidal failed to appear between the two tanks, the inspectors decided to continue their investigation of the remaining four crew members. They drove their car between the two tanks and up the dirt road towards the exit on East First Street. The inspectors passed Purizaga–Marin, who was still within the confines of the Belcher Oil Terminal, about 75–100 yards from the exit gate. When they reached the gate, the inspectors turned right onto East First Street and observed three figures walking toward them on the south side of the street, about 175–200 yards from the gate. As Inspector Loney drove past the three, Inspector Cunningham observed that the three figures were the three crew members. Cunningham again noticed their restricted manner of walking and their unusually heavy jackets, which were all zipped up. He also noticed that one of the crew members was carrying an empty duffle bag and another was carrying a radio, two items that he had not previously noticed.

Inspector Loney made a u-turn and parked next to the crew members. The inspectors got out of their car and, displaying their badges, introduced themselves as customs agents. The crew members produced their shore passes and explained in broken English that they were going into town to get some "señoritas."

At this time, Inspector Cunningham observed Purizaga–Marin walking on the other side of the street at a somewhat more rapid pace than he had been walking before. Purizaga–Marin passed the group without looking at or acknowledging his fellow crew members. Inspector Loney ran after Purizaga–Marin who had by then turned left and was walking "very fast" up O Street. After overtaking Purizaga–Marin and identifying himself, Loney asked Purizaga–Marin to return with him to the group on East First Street. Purizaga–Marin voluntarily complied and walked with

Loney back to East First Street. Loney again noticed that Purizaga–Marin was walking in a "very restricted" manner.

When the four crew members were together, Inspector Loney noticed that Purizaga–Marin had an unusual bulkiness around his mid-section and an expression on his face which further piqued Loney's suspicions. Loney began to pat down Purizaga–Marin, unzipped his jacket a bit, and touched his midsection where Loney observed the bulkiness. Loney felt a hard object and lifted up Purizaga–Marin's jacket. Several parcels, wrapped in brown shiny tape in the manner in which drugs are often packaged, fell to the ground. Inspector Cunningham drew his revolver and called for backup. Subsequent searches of the other three crew members revealed similarly hidden packages which, the inspectors discovered, contained a white powder. A field test determined that the powder was cocaine. A search of the SOLIMAR later that evening uncovered nine more packages of cocaine in Purizaga–Marin's room.

## II. Conclusions of Law

Defendants Costilla–Alfano, Farias–Caballero, Purizaga–Marin and Yamunaque–Nunez seek to suppress *inter alia* the cocaine discovered in the search on East First Street and the fruits of that search, *Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963), on the grounds that the search violated the Fourth Amendment's prohibition on "unreasonable searches and seizures." For the reasons set forth below, I find that the search was reasonable and deny the motions to suppress. Other issues presented by motions before the court have been addressed in an unpublished Supplemental Memorandum and Order of this date.

█ It is well established that customs officials may conduct routine searches at the border of the United States without reasonable suspicion, probable cause, or warrant. *United States v. Kallevig,* 534 F.2d 411, 413 n. 4 (1st Cir.1976). Such searches are not barred by the Fourth Amendment's prohibition of "unreasonable searches and seizures," the Supreme Court

has held, because they "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977).

> Consistently ... with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant.... [This rule is based on a] longstanding concern for the protection of the integrity of the border. This concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics.

*United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985) (footnotes and citations omitted).

The Supreme Court also treats as border searches those searches that occur at the functional equivalent of the border:

> Whatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*Almeida–Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1972) (holding nevertheless that an east-west road 25 miles north of the border that does not actually extend from the border is not the functional equivalent of the border).

It is uncontested that the search at issue here took place on East First Street in South Boston, approximately 175–200 yards from the exit gate of the Belcher Oil Terminal, which was another 300 yards from where the SOLIMAR was docked. It is also uncontested that, for purposes of the crew members of the SOLIMAR, the Belcher Oil Terminal was the functional equivalent of the border that night, and that the customs agents could have stood at the base of the gangplank during the SOLIMAR's entire stay in Boston and conducted border searches of everyone leaving the ship. *United States v. Moreno,* 778 F.2d 719, 721 (11th Cir.1985) ("point where a ship first docks in this country after entering our territorial waters from abroad" is "functional equivalent of the border").

Defendants suggest that they were already integrated into the "mainstream of domestic activity" at the time of the search at issue, *United States v. Wardlaw,* 576 F.2d 932, 935 (1st Cir.1978), and that consequently, the search was a regular non-border search for which the inspectors had to have probable cause. *United States v. Ortiz,* 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975). This suggestion is not supported by the evidence in this case.

Instead, the court concludes that the defendants had not yet completed an entry into the country at the time of the search, and that the search was some form of a border or extended border search. The customs inspectors observed the four crew members as they disembarked from the SOLIMAR and walked towards East First Street. Although the inspectors briefly lost sight of the defendants when the defendants walked past the oil tanks, the inspectors stopped the defendants on East First Street just 500 yards from the SOLIMAR and within nine minutes of the defendants' disembarkation. Within those nine minutes, the inspectors had one or more of the four defendants under visual surveillance for all but approximately four minutes. First, the inspectors momentarily lost sight of each defendant during the time that elapsed between the moment the

inspectors saw that defendant disappear behind the first oil tank and the moment they saw him reappear in the gap between the two tanks. Second, as to Costilla–Alfano, Farias–Caballero and Yamunaque–Nunez, the inspectors lost sight of each defendant during the time that elapsed between the moment the inspectors saw that defendant disappear behind the second oil tank and the moment when the inspectors stopped that defendant on East First Street. As to Purizaga–Marin, the inspectors lost sight of the defendant during the time that elapsed between the moment the inspectors saw him disappear behind the second oil tank and the moment that they saw him when the inspectors passed him on the dirt road in the Belcher Oil Terminal. After they passed him, the inspectors again lost sight of Purizaga–Marin until Inspector Cunningham observed him walking on the other side of East First Street. Finally, the inspectors briefly lost sight of Purizaga–Marin during the time that elapsed between the moment that he turned up O Street and the moment that Inspector Loney overtook him.

The search at issue here was much closer to the time that the defendants began the border crossing by walking along the gangplank than were numerous other searches that have been upheld by courts of appeals as border or extended border searches. In *Wardlaw*, the defendant arrived at San Juan International Airport and passed through customs and luggage inspection without incident. While the defendant was waiting in front of the airport building by the taxi stand, customs agents approached the defendant and asked her to return to the inside of the airport building where she was searched. The court concluded that the search was a border search, and that the search was justified because the agents had at least reasonable suspicion. 576 F.2d at 933–36. *See also United States v. Walters*, 591 F.2d 1195 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979) (valid border search where defendant passed through airport customs and luggage inspection and was approached fifty-five minutes later in airport lobby and asked to return to customs area); *United States v. Nieves*, 609 F.2d 642, 646–47 (2d Cir.1979), *cert. denied sub nom. Figueroa v. United States*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980) (same, although time period not specified); *United States v. Ramos*, 645 F.2d 318 (5th Cir.1981) (valid border search thirty minutes after defendant had passed through customs area and luggage inspection even though defendant had already checked into airport hotel); *United States v. Caicedo–Guarnizo*, 723 F.2d 1420, 1422 (9th Cir.1984) (citing cases which have upheld extended border searches that occurred seven hours and 105 miles from border, and fifteen hours and twenty miles from border).

The airport search cases are roughly analogous to the instant search of the defendants, which occurred within 500 yards of the pier. In those cases, the courts have treated as border searches those searches occurring within the "border area" (there, the area around the airport) and within relatively short periods of time. In each case, the touchstone inquiry was whether the customs officials could be reasonably certain that the defendant and contraband crossed the border. *See, e.g., Walters*, 591 F.2d at 1198. Here, the inspectors watched as the defendants disembarked and apprehended the defendants within nine minutes. The inspectors were thus certain that the defendants had in fact crossed the border. Furthermore, they were reasonably certain that the contraband crossed the border because the defendants, still in the process of entering the country while under surveillance, had not had an opportunity to obtain and conceal the objects that made them appear to walk with restricted movement.

Another case in point is *United States v. Glaziou*, 402 F.2d 8 (2d Cir.1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). There, customs officers were conducting a surveillance of the Brooklyn waterfront. In the early evening hours, the officers saw two men leave the gatehouse at Pier 7. Although the officers suspected that the men had disembarked from the recently docked freighter Le Moyne D'Iberville, the officers had not ac-

tually seen the defendants disembark nor had they even seen which direction the men had come from. The officers approached the men and questioned them on the street. The distance between the point at which the officers questioned the defendants and the gatehouse was 200 feet; the distance from the gatehouse to the actual pier where the freighter was docked was not reported. When the officers noticed that one of the defendants had a bulge in his midsection, the officer felt the bulge, asked the defendant to lift his shirt, and found packages of heroin.

The court ruled that this search occurred in the "border area" and was a valid border search:

> The term "border area" in this context, is elastic; the precise limits of the border area depend on the particular factual situation presented by the case raising the issue. For our purposes, it need only be said that "border area" reasonably includes not only actual land border checkpoints but also the checkpoints at all international ports of entry and a reasonable extended geographic area in the immediate vicinity of any entry point.

*Id.* at 12–13. Having determined that the search was a border search, the court concluded that the facts that the Le Moyne D'Iberville had recently docked at Pier 7 and that "the customs officers had observed the two men coming out of the Pier 7 gate at a time when the pier area was apparently deserted" were enough to justify the officers' decision to stop the defendants and investigate their exit. *Id.* at 14. When the court considered these factors along with the defendants' nervousness, the court found that "there were more than ample grounds for the officer to search" the defendant. *Id.* at 15.

It thus appears that the search at issue, like the search in *Glaziou*, was some kind of border search. Defendants, however, cite *United States v. Petersen*, 473 F.2d 874 (9th Cir.1973) and *United States v. Anderson*, 509 F.2d 724 (9th Cir.1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975) for the proposition that this search can not qualify as any kind of border search but rather, must be treated as an interior search. These cases, however, do not support defendants' contention.

In *Petersen*, law enforcement officials did not search the suspect's car when it crossed the border, without passengers, from Mexico. Instead, the officers followed the car. During their surveillance, the officers lost contact with the car for about ten minutes. By the time that they resumed their visual surveillance of the car, the driver had picked up two passengers. Noting that "unbroken surveillance is not always required," the court nevertheless suppressed the marijuana discovered in a search of the car because the officers could not know if the contraband crossed the border or if it had been loaded into the car when the driver picked up the passengers. 473 F.2d at 876. In the instant case, there was also a break in the visual surveillance, but here, as the court found above, the inspectors were reasonably certain that whatever the defendants were carrying to make them walk stiffly crossed the border with the defendants.

*Anderson* is similarly unhelpful to defendants' contention. There, a cursory search of defendant's car at the Mexican border uncovered nothing. Defendant then drove 25 miles north, stopped at various bars, a gas station, a motel, and a café, picked up four passengers, and then parked on the shoulder of a highway where he retrieved a small package from beneath a limb of a lone palm tree. A subsequent search uncovered a small amount of heroin in defendant's trousers. Given these events, the court held, the officers could not be reasonably certain that the heroin crossed the border. 509 F.2d at 726. Obviously, the circumstances of the instant case offer no similar uncertainty about whether the contraband, found within nine minutes and 500 yards of the disembarkation, was concealed on the defendants when they crossed the gangplank and proceeded beyond with restricted movements.

Finally, defendants suggest that the search could not be a border search because the defendants were cleared by cus-

toms that morning, issued shore passes, and may have, as Farias–Caballero apparently did (see Supplemental Affidavit of Counsel Gillespie (Docket No. 99) at ¶ 3), already disembarked from and returned to the SOLIMAR earlier in the day. As the court held in *United States v. Yee Ngee How*, 105 F.Supp. 517, 521 (N.D.Cal.1952), this contention must fail:

> [It is not] logical to suppose that a crew member, in the course of smuggling contraband, will remove his goods from the ship in the course of his first trip into the city. A ship presents a much more complex problem to government agents charged with preventing smuggling than does any other type of conveyance in which men and goods cross the international boundary. Initially, the size and intricate construction of a ship create more hiding places for contraband than does an automobile, an aircraft, a steed, or a train. This fact makes it more difficult to conduct a thorough search of the vessel immediately after arrival.

*See also United States v. Espericueta–Reyes*, 631 F.2d 616 (9th Cir.1980) (valid extended border search even though defendant was also searched at initial border crossing).

The court thus finds that the defendants were not yet assimilated into the mainstream of domestic activity and concludes that the search at issue was within the scope of the definition of a border or extended-border search as precedents have developed the meaning of these terms. *Wardlaw*, 576 F.2d at 935.

If the search is to be classified as some type of border search, the defendants argue that the search was at least an "extended border search" and that validity of such a search depends upon reasonable suspicion of criminal activity and a reasonable certainty that the subject and contraband crossed the border. *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir.1985); *Jasinski v. Adams*, 781 F.2d 843, 846–47, *reh'g denied*, 788 F.2d 694 (11th Cir.1986); *United States v. Delgado*, 810 F.2d 480, 483–84 (5th Cir.1987). The government, in contrast, contends that the search was a regular border search and that the inspectors could have searched the defendants even with no level of suspicion. *Kallevig*, 534 F.2d at 413 n. 4. The Magistrate, suggesting an intermediate category, recommended that this court treat the search as a "nonroutine border search" requiring an intermediate level of suspicion which he called "mere suspicion."

In relation to different methods of searching (*e.g.*, pat-down searches, strip searches, body cavity searches), as contrasted with different kinds of "border" searches, the First Circuit has avoided creating discrete categories each with a different requirement as to the level of suspicion. Instead, the court has quoted with approval the "balancing" standard used by the Court of Appeals for the Seventh Circuit: " '[w]hat is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveller.' " *Wardlaw*, 576 F.2d at 934 (quoting *United States v. Brown*, 499 F.2d 829, 833 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974)). In applying this test, the First Circuit also cited with approval the Fifth Circuit's interpretation of *Brown*: "The quantum of facts necessary to justify a search is related to the degree of the intrusion." *Wardlaw*, 576 F.2d at 934 (citing *United States v. Afanador*, 567 F.2d 1325, 1328 (5th Cir.1978)). The First Circuit has not, however, directly considered whether a similar "balancing" or "factors" test, rather than a test with discrete categories each with a different requirement as to level of suspicion, should be used in the context of different kinds of "border" searches (*e.g.*, routine border searches, nonroutine border searches, extended border searches).

The Supreme Court's Fourth Amendment jurisprudence also favors flexible "balancing" tests over multiple, distinct categories, each with its own test of reasonableness:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search

against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979) (discussing searches of prison inmates, but citing, *inter alia,* several border search cases—*Ramsey, United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). More recently, in another non-border Fourth Amendment case, the Court required the use of a "balancing" test with a consideration not merely of specified "factors," but instead, of "the totality of the circumstances—the whole picture.... Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." *United States v. Sokolow,* — U.S. ——, 109 S.Ct. 1581, 1585, 1586, 104 S.Ct. 1 (1989). There, DEA Agents stopped the defendants upon their arrival from Miami at Honolulu Airport; a subsequent search uncovered more than a kilogram of cocaine. After considering the totality of the circumstances, the Court upheld the validity of the search, finding that the agents had reasonable suspicion.

In a related area of Fourth Amendment law, the Supreme Court has explicitly mandated the use of a "factors" test—indeed, the extreme form of "factors" test, that is, an "all-factors" or "totality of the circumstances" test—for determining whether a defendant possessed " 'a legitimate expectation of privacy' in the area searched." *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). The nature of the "legitimate expectation of privacy" test as a "factors" test is underscored by *United States v. Aguirre,* 839 F.2d 854, 856–57 (1st Cir.1988), wherein the First Circuit adopted a two-tier analysis (first, existence or nonexistence of a subjective anticipation of privacy, and, if defendant meets that tier of the test, second, objective reasonableness of such an expect-ancy under the facts of a given case), and applied a factors test to each tier. "Whatever facts may shed light upon either step of this two-tier inquiry may be weighed in the balance." 839 F.2d at 857.

■ Reading the First Circuit precedents together with all the Supreme Court opinions that have a bearing, I conclude that when confronted with an issue regarding a search without a warrant at or very near the time and place of a border crossing, a court must take account of an array of relevant factors, considering the way in which and the extent to which each has a bearing upon the outcome, and then reach a single determination either that the search was "reasonable" in the circumstances, or instead that it was "unreasonable" and therefore in violation of the Fourth Amendment. That is, once it is determined that the search was not what the Supreme Court and the First Circuit have defined as a "routine border search," the legal test for determining whether the search was an "unreasonable search" forbidden by the Fourth Amendment is not a test that creates a series of discrete categories of "border area search," "extended border search," "near the border search," and such other additional categories as may be developed, each with a different requirement such as "mere suspicion," "real suspicion," "reasonable suspicion," or "probable cause." Instead, the test is one that requires the court to "weigh" or "balance" many factors and to consider them, in the words of Judge Friendly (albeit in a quite different context), "not discretely, but together," in a single assessment that makes a determination of outcome based upon a weighing of all the relevant factors. *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 983 (2d Cir. 1984) (identifying, with regard to Fed.R. Civ.P. 24(a)(2), "components" to be considered in determining whether a motion for "intervention as of right" should be allowed).

The precedents mandating the use of a "factors" test in the context of an inquiry with regard to "a legitimate expectation of privacy" are, of course, not directly in point

as to a border search. Similarly inapposite are *Bell,* in which the Supreme Court promulgated a "balancing" test for a case involving body-cavity searches of prison inmates, and *Sokolow,* in which the Supreme Court used a "balancing" test for a case involving a non-border airport search. As noted above, however, in *Bell,* the Court did cite three of its border-search precedents in support of the proposition that "[t]he test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." 441 U.S. at 559, 99 S.Ct. at 1884.

Even if not so stating as explicitly as in these other contexts, however, both the Supreme Court and the First Circuit have at least implicitly approved use of a "factors" test in relation to searches at or near a border, at or near the time of crossing the border. "[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. at 3309. *See also Almeida–Sanchez,* 413 U.S. at 272–73, 93 S.Ct. at 2539–40 (concerning searches at functional equivalents of border); *Wardlaw,* 576 F.2d at 934 ("the level of suspicion of the agent [balanced] against the level of indignity perpetrated upon the traveller").

I find that the search at issue was not a routine border search in the literal sense. That is, it was not a routine search conducted at a fixed checkpoint or inspection station, like those conducted at the physical border or at an international airport, where all who cross are subject to investigation. Thus, I conclude, the reasonableness of this search is not automatic as it would be if it were a routine border search in the literal sense. Rather, it is to be judged by a factors test.

Applying a factors test that takes account of all the circumstances and requires a single determination as to whether the search of each defendant, in this case, was reasonable, I find that each search was reasonable.

If, however, I were to assume that a test involving discrete categories should be used with a separate requirement as to level of suspicion for each, I would conclude that the search in this case—which was close both geographically and temporally to the actual border crossing and which was not physically invasive—was in the nature of a "nonroutine border search." In that case, I would conclude that the requisite level of suspicion would be the intermediate "mere suspicion" standard. Also, even if the most stringent standard arguably applicable to such a search were applied, and "reasonable suspicion" were required, I find that the facts here would satisfy that requirement. I find that, as to each defendant, at the time that defendant was stopped, the inspectors had a reasonable suspicion of criminal activity that justified the search. These findings and conclusions thus provide independent grounds for denial of these motions to suppress.

The reasonable suspicion standard, the First Circuit has held, "requires the Government to demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched. The quantum of facts necessary to justify a search is related to the degree of the intrusion." *Wardlaw,* 576 F.2d at 934 (citations omitted). Here, I find that the government has demonstrated more than enough objective, articulable facts to justify this intrusion both under a "factors test" and under a "reasonable suspicion" standard.

The inspectors had reasonably reliable information that the SOLIMAR was a "high risk vessel" for smuggling drugs into the United States because it had come directly from Peru, a known source country for drugs, it had an all Peruvian crew, and it had been in the waters around New England before. This last point was significant, the inspectors explained, because any smugglers aboard the SOLIMAR would have had an opportunity to learn how the customs authorities operated in this area and to feel comfortable in this area.

Defendants argued that the fact that the SOLIMAR had a Peruvian crew could not

alone justify a finding of probable cause. Yamunaque–Nunez's Memorandum of Law (Docket No. 117) at 4. Here, however, defendants' known ethnicity was one of many factors which contributed to the inspectors' reasonable suspicion. Furthermore, the Supreme Court has explicitly approved of the use of ethnic appearance as a factor relevant to the decision of whether to make a stop. *Brignoni–Ponce,* 422 U.S. at 887, 95 S.Ct. at 2583 (Mexican appearance of car occupants, although not alone sufficient to justify a stop, was a relevant factor in deciding whether to stop a vehicle near the Mexican border to question occupants about their citizenship and immigration status). *See also Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. at 3309 ("[a]utomotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity").

Defendants also objected, with regard to this factor, to the characterization of the SOLIMAR as a "high risk vessel" because the inspectors had made no effort to determine whether any of the specific crew members, as opposed to the ship itself, had been in these waters before. Although defendants raise a valid point, it goes only to the weight to be accorded to this factor, rather than requiring the court to disregard this factor altogether. The court thus rejects defendants' contention "that the ship's prior presence, by itself, is irrelevant to reasonable suspicion" and that "[n]o reasonable inference ought to be allowed unless the government had determined that the crew members themselves had been in these waters before." Purizaga–Marin's Objection to Report and Recommendation at 1, ¶ 1 (Docket No. 143).

The court finds also that the defendants' manner of dress is a relevant factor. Although the inspectors may not have noticed it when the defendants first crossed the gangplank, the inspectors did notice the defendants' unusually heavy jackets, which were all zipped up, when the defendants passed in front of them between the two oil tanks and again when the inspectors stopped the defendants on East First Street. Defendants attempted to argue that it was colder and windier on the water than in the city, but they failed to seriously undermine the inspectors' testimony concerning their observations and judgment that the jackets were unusually heavy given the mild night.

The court finds it relevant, also, that the inspectors' noticed that the defendants were walking in a stiff manner with restricted movements. This suspicious manner of walking was clear to the inspectors as each defendant walked between the two tanks and again as the inspectors drove past the defendants. Also, the inspectors noticed that the defendants' abdomens appeared bulkier than would be expected given their height and build. That the inspectors failed to put these observations in their initial reports, though relevant to credibility, is not a weighty factor because those reports are meant to record the major occurrences of the investigation; it is not surprising or suspicious that a report does not include every observation made during the surveillance that might later have some legal relevance.

Another factor the court finds relevant is that the inspectors had reason to be suspicious when Purizaga–Marin walked past his fellow crew members without looking at or acknowledging them. Defendants argued that the inspectors never saw Purizaga–Marin directly next to, or in conversation with, the other defendants, because Purizaga–Marin had crossed the gangplank about thirty seconds after the other three. Nevertheless, ignoring one's fellow crew members on the street is behavior that is a relevant factor bearing upon reasonable suspicion. That Purizaga–Marin turned up O Street and began to walk very rapidly was further evidence to support an inference that some criminal activity was afoot.

Additional support for reasonable suspicion came to the inspectors' attention once they had gathered the defendants together. Inspector Loney looked at Purizaga–Marin's abdomen and noticed that Purizaga–Marin had a large bulkiness around his waist. When Loney looked up, he saw an expression on Purizaga–Marin's face that the inspector interpreted as one indicative of something being wrong.

A final factor that weighs in favor of a conclusion that the search did not violate any defendant's Fourth Amendment rights is the relative non-intrusiveness of the search. The search at issue did not involve the invasiveness inherent in a strip search, a body cavity search, or an involuntary x-ray search. Rather, the search was merely a pat-down search which entails a minor "level of indignity perpetrated upon the traveler." *Wardlaw,* 576 F.2d at 934; *see also United States v. Braks,* 842 F.2d 509, 512–13 (1st Cir.1988) ("the only types of border search of an individual's person that have been consistently held to be non-routine are strip-searches and body-cavity searches"); *United States v. Palmer,* 575 F.2d 721, 723 (9th Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978) ("[l]ifting of the skirts to reveal an undergarment is a far less intrusive examination [than a strip search] and requires less justification to render it reasonable").

Accordingly, for the reasons and upon the weighing of the factors stated above, the court concludes that the search was reasonable under the circumstances and that no defendant's Fourth Amendment rights were violated. Consequently, the court denies Costilla–Alfano's, Farias–Caballero's, Yamunaque–Nunez's and Puriza-ga–Marin's motions to suppress the cocaine discovered in this search and all evidence discovered as the fruits of this search.