UNITED STATES of America, Plaintiff,

v.

Jobert BROWN, Defendant.

Crim. No. 93–378(HL).

United States District Court,
D. Puerto Rico.

May 20, 1994.

Miguel A. Pereira, U.S. Atty., for plaintiff.

Thomas Lincoln, Old San Juan, PR, for defendant.

## OPINION AND ORDER

LAFFITTE, District Judge.

Before the Court is defendant Jobert Brown's ("Brown") motion to suppress evidence seized by San Juan Municipal Guardsmen and the government's opposition thereto. An evidentiary hearing concerning the various grounds raised in Brown's suppression motion was held on February 24 and 28, 1994. The parties have fully briefed the issues and the Court is now ready to rule. For the reasons set forth below, the Court denies Brown's motion to suppress evidence.

## FACTUAL BACKGROUND

On December 5, 1993, the cruiseship M/V Windward "Windward" docked in Old San Juan. Defendant Brown was a crewmember aboard the Windward. Prior to the vessel's arrival, both the Windward's captain and the shipping company's agent, Jose Davila Ayala "Davila" advised the U.S. Customs Service that unidentified crewmembers might attempt to smuggle narcotics into San Juan.

On the morning of the Windward's arrival, United States Customs Inspector Juan M. Lopez "Lopez" was on site inspecting disembarking passengers and crewmembers. While inspecting intransit crewmembers, Lopez witnessed Brown, without clearing customs, exit the inspection area and walk toward the street. Brown was approximately two to five feet from Lopez when Lopez observed that Brown's midsection appeared bulky. Lopez called to defendant Brown to stop walking. Brown did not respond. Lopez again shouted at Brown to stop. At first, Brown complied, only to start running toward the street as Lopez approached him. Brown never cleared customs.

Customs inspectors Lopez and Quinones began to chase Brown. Shipping agent Davi-

la witnesses the incident and also began to run after Brown. Shortly thereafter, Lopez lost sight of both Brown and Davila. However, within minutes of assisting in the pursuit, Davila ran into municipal guard Vazquez and requested his assistance.[1] Davila claims that he informed Vazquez that Brown had drugs and was going to get away. The guard asked Davila for Brown's description and Davila and Vazquez proceeded to chase Brown by motorcycle.

Just prior to the above meeting, Vazquez along with two other guardsmen, Rodriguez and De Jesus, were notified by radio that there had recently been a hold-up on a nearby street. The two additional guardsmen, Rodriguez and De Jesus also joined the chase. These two officers clearly were not informed that Brown was being chased for failure to stop at customs. Instead, they believed Brown was a suspect from the hold-up.

Davila and the three Municipal guardsmen, Vazquez, Rodriguez and De Jesus continued to chase defendant Brown through Old San Juan. Officer Vazquez testified that he could see the person Davila described and that said person was walking as if nothing had occurred. In fact, Brown ran only part of the time, sometimes he simply walked.

Vazquez used his motorcycle to block the passageway where Brown was running. Brown then tried to evade his pursuers by cutting through the back kitchen entrance of a nearby restaurant. Davila got off the motorcycle and yelled to the restaurant employees to stop defendant Brown and that Brown had drugs.

Accordingly, as a kitchen employee pushed Brown against the wall, guardsmen De Jesus and Rodriguez grabbed Brown and forced him outside. De Jesus patted Brown down while Vazquez alerted for weapons. De Je-

sus testified that he was looking for weapons and that he searched Brown for his safety.[2] De Jesus touched Brown on the stomach and noticed a bulge in Brown's midriff. He then found two packages wrapped in black tape. The packages contained cocaine. Vazquez also testified that during this time he too was on alert for weapons so that Brown could not harm the officers.

Within one minute, Custom inspector Lopez spotted Brown, Davila, and the municipal guardsmen. Lopez approached the group and proceeded to pat down Brown himself. Lopez testified that at the most five minutes had elapsed since he initially saw Brown at the Pier and ultimately performed the pat down search. In contrast, Davila claims that the chase lasted approximately ten minutes. Finally, Lopez performed a complete customs search of Brown once Brown was taken to municipal headquarters. No additional contraband was found.

## DISCUSSION

In the instant case Brown challenges the seizure of evidence on several separate grounds. First, Brown alleges that the warrantless search conducted by the municipal guardsmen was not a border search. Second, Brown claims that his seizure amounted to an arrest without probable cause and that even if the seizure was a valid Terry stop, the subsequent pat down search did not meet fourth amendment standards. Finally, Brown argues that the "inevitable discovery" doctrine is inapplicable.

### A. The Border Search

■ The government claims that the warrantless search of Brown's person was a "border search" authorized under 19 U.S.C. § 1467. In essence, the government claims that the search was an extended border search and that 19 U.S.C. § 507(a) conferred

---

1. Defendant refers to an officer Zayas throughout his motion to suppress. However, the suppression hearing transcript clearly shows that defendant is mistaken. Instead, he should be referring to officer Vazquez.

2. Officer De Jesus testified that he performed the pat down search for weapons under the assumption that Brown was the individual involved in the holdup. He further stated that it was not

until after said search was completed that he actually learned of the true circumstances surrounding Brown and the fact that he had run from the customs area. Officer Rodriguez' testimony also supports this contention. In fact, these two officers testified that when they were approached by Davila and told that Davila was chasing Brown, they believed that they were chasing the individual involved in the holdup.

upon the guardsmen "authorization" to act as customs agents. Defendant Brown argues that the search cannot be characterized as a border search because it was not conducted by an individual authorized by statute to perform said type of search.

■ Border searches are unique in the law of search and seizure. The mere entry into the United States from a foreign country provides sufficient justification for a border search. *United States v. Alfonso*, 759 F.2d 728 (9th Cir.1985). It is well established that the right of the sovereign to conduct "border searches" supersedes an individual's privacy rights and that said border searches are not subject to the Fourth Amendment's warrant provision. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Nevertheless, border searches are not without limitation or qualification.

■ In order for a border search to be valid, it must be executed either by a person statutorily authorized to conduct border searches or by an individual who by a delegation of authority is so empowered. *United States v. Victoria–Peguero*, 920 F.2d 77, 81 (1st Cir.1990); *People of Territory of Guam v. Villacrusis*, 992 F.2d 886, 887 (9th Cir. 1993); *United States v. Gomez–Osorio*, 957 F.2d 636, 643 (9th Cir.1992); *Alfonso*, 759 F.2d at 735; *United States v. Soto–Soto*, 598 F.2d 545, 549 (9th Cir.1979)

■ Furthermore, the delegation of authority must be clear. In *Gomez–Osorio*, said delegation consisted of a formal written agreement between the U.S. Customs Service and the Culver City Police Department whereby the police officers were specifically authorized to assist Customs and were under the direct supervision of the Senior Customs agent on the scene. *Gomez–Osorio*, 957 F.2d at 638. In *Alfonso*, a search conducted by a non-customs agent did not nullify the border search where the search was "part of a collaborative effort under the aegis of and in cooperation with customs agents."

The *Alfonso* Court reasoned that the presence and supervision of a customs agent in a coordinated search distinguished the search from a "random" law enforcement effort. *See also, Victoria–Peguero*, 920 F.2d at 82

(warrantless search by FURA officers considered border search since officers were part of a coordinated customs effort designed to prevent importation of illegal drugs); *Villacrusis*, 992 F.2d at 886–87 (border search valid where national guardsmen conducted search in presence of customs officer and at customs officer's direction); *Soto–Soto*, 598 F.2d at 549 (warrantless search invalid where officer was not working in cooperation with customs agents and search was made as part of a general law enforcement effort)

Municipal guardsmen De Jesus cannot be considered an individual authorized to perform a border search. In the instant case, there was no clear designation of authority. First, there is no formal agreement between the customs department and the municipal guards. Second, Lopez and the officers testified that there was not even an order by a customs official directing the officers to search Brown. Finally, the government's argument that 19 U.S.C. § 507 is applicable to the present situation and that said statute empowers municipal officers to conduct border searches is clearly inaccurate. This statute does authorize customs officials to demand from individuals assistance in the performance of their duties. Nevertheless, this statute in no way authorized said "assistants" to conduct warrantless border searches. *See generally*, 132 CONG.REC. S12021 (daily ed. August 15, 1986). The government's argument that the warrantless search is a border search therefore fails.

**B. The Terry Stop**

■ The government argues that the evidence still need not be suppressed since the officers investigative stop of Brown is valid. Defendant counters that the evidence must be suppressed since Brown's seizure did not constitute a Terry stop and instead amounted to an arrest without probable cause.

■ Police may stop and briefly detain a person for investigative purposes if they have reasonable suspicion supported by articulate facts that a crime is afoot. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Factors that may justify an investigative stop based on reasonable suspicion include "the time of the day, the

"high crime" nature of the area, an informant's tip that persons might be armed, furtive hand movements, flight or attempted flight by the person sought to be detained, and a pressing need for immediate action" *United States v. Laing,* 889 F.2d 281, 285 (D.C.Cir.1989). *See Also, Michigan v. Chesternut,* 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988) (Kennedy and Scalia, J.J., concurring) (unprovoked flight from police provides ample cause for Terry stop.); *United States v. Sharpe,* 470 U.S. 675, 682 n. 3, 105 S.Ct. 1568, 1573 n. 3, 84 L.Ed.2d 605 (1985) (evasive action relevant in determining whether officers had reasonable suspicion)

■ Furthermore, the knowledge of one officer who possesses reasonable suspicion may be imputed to a fellow officer who effects a Terry stop at his behest. *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Ferreira,* 821 F.2d 1, 5 (1st Cir.1987) (first police officer's reasonable suspicion conveyed to second officer by yell to stop defendant)

In the instant case, reasonable suspicion to stop defendant Brown was present. Officer Vazquez received information from Davila, who was chasing Brown, that Brown was possibly carrying drugs. Vazquez observed Davila chasing Brown and Brown continuing to run even after the municipal officers joined the chase. Furthermore, officers De Jesus and Rodriguez had received reliable information that a hold up had just been committed in the area. Finally, the officers had collective knowledge that Brown had run from the customs area. Thus, the Terry stop is valid as long as it was not converted into an arrest.

■ There are three basic types of contact between officers and the public. *United States v. Flowers,* 909 F.2d 145, 147 (6th Cir.1990). The first type of contact is the one initiated by an officer without any reasonable suspicion, also known as the police-citizen encounter. Second, there is the investigative stop, also known as the Terry stop. Here, a citizen is temporarily detained based upon "reasonable suspicion." This type of contact does not violate the fourth amendment as long as a police officer observes conduct leading him to reasonably

conclude in light of his experience, that criminal activity may be afoot. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Finally, there is the de facto arrest which must be based on probable cause to avoid offending the constitution.

The Supreme Court acknowledges that its decisions "may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest." *Sharpe,* 470 U.S. 675, 105 S.Ct. 1568. The First Circuit has also concluded that there is no scientifically precise formula enabling courts to distinguish between investigatory stops and de facto arrests. *United States v. Zapata,* 18 F.3d 971 (1st Cir.1994). Nevertheless, there are factors which aid said determination.

■ For instance, if excessive force is used in an investigative stop or the duration of the stop is extended, at some point the confrontation is no longer justified as a Terry stop. Nevertheless, the use of guns and the presence of more than one officer does not necessarily convert a Terry stop into a de facto arrest. *United States v. Maguire,* 918 F.2d 254, 259 (1st Cir.1990) *See also United States v. Hensley,* 469 U.S. 221, 235–36, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985) (detention was investigative stop even where officer approached defendant's car with gun drawn and pointed in air); *United States v. Taylor,* 716 F.2d 701, 708 (9th Cir.1983) (Amount of force used to carry out stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lay down to prevent flight.)

In the instant case, Defendant urges that the police officers "illegally arrested" Brown by grabbing him by the shoulders and taking him out from the restaurant and into the street. This argument is ineffective. *Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585 (upholding investigative stop although officers grabbed suspect by the arm and moved him onto the sidewalk). The officers were performing a valid Terry stop when, after chasing the defendant, they stopped him and took him outside the restaurant. Furthermore, "mere numbers do not automatically convert

a lawfully Terry stop into something more forbidding." *Zapata,* 18 F.3d at 976.

The officers never brandished weapons nor voiced any threats. Furthermore, the officers' testimony demonstrates that they did not turn the stop into an arrest. No excessive force was used to effectuate the Terry stop and a reasonable person in defendant's circumstances would not have understood that the situation was tantamount to a arrest. *Id.* Accordingly, Brown was only subjected to a valid Terry stop and was never arrested.

## C. The Pat Down

█ Brown's next argument urges that even if the Terry stop was reasonable, the subsequent pat down search of Brown's person violated the bounds set forth under *Terry.*

█ An officer may conduct a pat down search for weapons when said officer is justified in believing that the individual he is investigating at close range is armed and presently dangerous to the officers or to others. *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881. Furthermore, the test does not require that the officer be absolutely certain that plaintiff is armed. *Lewis v. City of Boston,* 829 F.Supp. 471, 475 (D.Mass.1993). Instead, the issue is whether a reasonable prudent person in the circumstances would be warranted in the belief that his safety or that of others is in danger. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

The record indicates that municipal officers Rodriguez and De Jesus had just received a radio call informing them of a recent nearby holdup when they were approached by Davila and officer Vazquez and asked to assist in the chase of defendant Brown. Due to the pressing need for instantaneous action, it was reasonable for the officers to believe that Brown was the individual involved in the holdup and for them to conclude that Brown was potentially armed.

Furthermore, even if Brown's running, Vazquez and Davila's request for assistance and the radio call are insufficient to justify a pat down search for weapons, other factors which illustrate the need for a weapons search were also present. For instance, the officer's concern for his own safety is of paramount importance. *United States v. Walker,* 924 F.2d 1, 4 (1st Cir.1991) Officer De Jesus testified at the suppression hearing that he had a concern for his safety when he conducted the weapons search. Although he also stated that Brown did not resist arrest or act in a threatening manner, under a totality of the circumstances, the pat down search was justified.

█ Defendant has not raised the issue that the manner in which the pat down search was performed exceeded the lawful limitations of a *Terry* search. Nevertheless, the Court will address this argument sua sponte.

As long as it was reasonable for the officers to search Brown for weapons, said offers can seize any contraband detected as long as the search is "limited to that which is necessary for the discovery of weapons which might be used to harm the officer." *Minnesota v. Dickerson,* —— U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

In *Dickerson,* the Supreme Court found that the *Terry* search was invalid because the officer continued to search the defendant's pocket even after he concluded that said pocket did not contain a weapon. Thus, the Court reasoned that a warrantless seizure of contraband discovered by touch in a *Terry* weapons search is justified only so long as the police officer does not continue to explore an area after surmising that there is no weapon in that area. Instead, the officer must lawfully pat down a suspect's outer clothing and seize only an object whose counter or mass makes its identity immediately apparent. *Id.* at ——, 113 S.Ct. at 2136.

In the case before the Court, Officer De Jesus testified that the nature of the contraband was immediately apparent to him when he touched Brown's midsection. Furthermore, there is no evidence that De Jesus continued to search Brown's midsection after concluding that Brown was not hiding a weapon there. Accordingly, the seizure was justified and not outside the lawful limits of a *Terry* search. *Id.* at ——, 113 S.Ct. at 2138.

## D. Inevitable Discovery Doctrine

■ Finally, even if the frisk for weapons exceeded the bounds of a Terry stop, suppression is inappropriate since the contraband would have been inevitably discovered.

■ The inevitable discovery doctrine is an exception to the exclusionary rule and is applicable whenever "the government can prove that the evidence would have been admitted regardless of any overreaching." *Nix v. Williams,* 467 U.S. 431, 447–48, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). In this regard, the government bears the burden of demonstrating by a preponderance of the evidence that the evidence which was obtained by unlawful means would have been inevitably secured in some other lawful way. *Id.,* 467 U.S. at 444–45, n. 5, 104 S.Ct. at 2509, n. 5.

In order to secure that the evidence should in fact be used at trial, the First Circuit has set out the following three factors:

(i) the lawful means of its discovery are independent and would have necessarily been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

*Zapata,* 18 F.3d at 978; *United States v. Silvestri,* 787 F.2d 736, 744 (1st Cir.1986)

In the instant case, the above test is satisfied. The record clearly establishes that customs inspector Lopez noticed a bulge in Brown's midsection and ordered him to stop. It also clear that Brown ran from the customs area without clearing customs and that Lopez chased after him to try and catch him to conduct a search. Because customs official are independently granted the power to conduct "extended border searches," inspector Lopez surely would have been permitted to conduct a body search, in accordance with standard procedures, once Brown was stopped.[3] In the process of said search, the two bags of contraband would certainly have been discovered. *See Generally People of Territory of Guam v. Villacrusis,* 1992 WL

97217 (D.Guam App.Div., Apr. 16, 1992) *aff'd,* 992 F.2d 886, 887 (9th Cir.1993). Therefore, even if the municipal officers had not frisked Brown for weapons and had instead simply stopped him and waited for Lopez to arrive one minute later, the evidence still would have been discovered.

Courts have uniformly approved the use of warrantless border searches by customs officials. *Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617. Furthermore, these searches require neither a warrant, probable cause, nor even reasonable suspicion. *Id.; United States v. Des Jardins,* 747 F.2d 499, 502 (9th Cir.1984). Finally, these border searches do not offend the Fourth Amendment. *Alfonso,* 759 F.2d at 728.

Accordingly, Brown's motion to dismiss must be denied. The evidence was seized pursuant to a valid Terry stop. Furthermore, the subsequent Terry search for weapons did not violate Brown's Fourth Amendment rights. Finally, the evidence would have been inevitably discovered by a U.S. Customs agent.

**IT IS SO ORDERED.**

---

**3.** Defendant's final argument that the search cannot be considered an "extended" border search is not supported by the evidence. *See*

*United States v. Costilla–Alfano,* 726 F.Supp. 327 (D.Mass.1989).